## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

GRIMES & COMPANY, INC.

               Plaintiff,

      v.

BRIAN G. CARLSON,

             Defendants.

Case No. 4:24-cv-11521-MRG

## MEMORANDUM OF DECISION ON GRIMES & CO.'S MOTION FOR A PRELIMINARY INJUNCTION

**GUZMAN, J.**

Plaintiff Grimes & Company, Inc. ("Grimes & Co." or the "Company") brings this action against its former employee, Defendant Brian G. Carlson ("Carlson") for breaching non-solicitation and non-disclosure restrictive covenants set forth in a Confidentiality and Restrictive Covenant Agreement he signed during his employment with Grimes & Co. [ECF No. 1].[1] This case is before the Court on diversity jurisdiction.[2]

According to Grimes & Co., Carlson had, among other things, breached the agreement by soliciting Grimes & Co.'s active clients to provide investment advisory services and transfer their business to Carlson's new company, Advisors Capital Management, LLC ("ACM"). [ECF No. 1 ¶¶ 44 & 45]. Before the Court is Plaintiff's preliminary injunction motion against Defendant seeking to enjoin the Defendant from soliciting its clients and misusing any of its confidential

---

[1] All pincites refer to ECF pagination.
[2] Grimes & Company, Inc. ("Grimes & Co.") is a Massachusetts-based investment service company, [ECF No. 1 ¶ 7] and Carlson is a resident of New York. [Id. ¶ 8]. The amount in controversy also exceeds $75,000. [Id. ¶ 10].

information. [ECF No. 11]. On August 13, 2024, the Court held an in-person motion hearing pertaining to the pending preliminary injunction. [ECF No. 24].

For the reasons stated at the hearing and in this Memorandum, Grimes & Co.'s preliminary injunction motion [ECF No. 11] is **GRANTED**.

## I.    BACKGROUND

The relevant facts, most of which are undisputed, are as follows.

### A.  Factual Findings

Grimes & Co. is a Registered Investment Advisor ("RIA") that specializes in discretionary portfolio management and wealth management services for clients across the country.[3] [ECF No. 1-1 ¶ 5]. In order to develop and maintain partnerships within the RIA industry, Grimes & Co. asserts that it invests significant time and resources into the process of keeping its clients' "confidential and proprietary business information" secure. [See id. ¶¶ 10-11]. Grimes & Co. contends that this information includes, in relevant part, their "past, present and prospective clients [identities and contact information], account numbers, investment objectives, service requirements, and fees charged" (collectively, the "Confidential Information"). [Id. ¶ 12 (emphasis omitted)]. Grimes & Co. alleges that it operates within a "highly competitive" industry and has identified numerous steps it takes to protect this information, such as, requiring its employees to sign a Confidentiality and Restrictive Covenant Agreement. [See id. at 5-6; ECF No. 21 at 24].

In 2016, Grimes & Co. hired Carlson as a Financial Advisor and the two parties executed the aforementioned Confidentiality and Restrictive Covenant Agreement (the "2016 Agreement"),

---

[3] As an RIA, Grimes & Co. maintains a contractual relationship with promoting firms including Fidelity Investments ("Fidelity") and Charles Schwab ("Schwab"). [ECF No. 1-1 ¶ 6]. These types of partnerships consist of investment companies referring "clients who express a need and/or interest in securing professional portfolio management and wealth management services to Grimes & Co. Absent the contractual relationships Grimes & Co. has with Fidelity & Schwab, Fidelity & Schwab would not refer their clients to Grimes & Co." [Id.].

containing "restrictive covenants governing [Plaintiff's] conduct both during and after [Plaintiff's] employment with the Company." [ECF No. 1-1 ¶ 18 (emphasis omitted)]. As a Financial Advisor, Carlson's job duties and responsibilities with Grimes & Co. consisted of using the company's Confidential Information to assist clients identify financial goals and to work with "Grimes & Co.'s portfolio management team to design investment allocations and determine strategy selections to meet clients' needs." [Id. at 7]. On May 31, 2023, in consideration of his continued employment, Defendant entered into another Confidentiality and Restrictive Covenant Agreement (the "2023 Agreement"), which included confidentiality provisions and non-solicitation restrictions that were very similar to the 2016 Agreement.[4] [Id. ¶ 31]. The 2023 Agreement that outlined Carlson's obligations both during and after his employment, expressed, in relevant part:

> I agree not to use, communicate, reveal or otherwise make available such Confidential Information for any purpose whatsoever, nor will I divulge (or cause to be divulged) any such Confidential Information to any person, partnership, corporation or entity other than the Company except: (i) in furtherance of my employment duties to the Company; (ii) as required to testify truthfully . . . or (iii) to the U.S. Securities and Exchange Commission about a possible securities violation . . .

> [D]uring my employment/association with the Company, and for a period of twenty-four (24) months subsequent to termination of my employment/association for any reason (regardless of the circumstances surrounding termination), shall not, directly or indirectly, in any manner . . . solicit to render, nor render or accept . . . in any other capacity, for the benefit of any person or entity other than the Company, any . . . securities and insurance sales or brokerage . . . business from/to (i) any person or entity who is a client . . . of the company at the inception of my employment/association, or becomes a client of the Company during the term of my employment association, unless otherwise specifically excluded[.]

---

[4] The 2023 Agreement superseded the 2016 Agreement. [ECF No. 1-1 at 6]. Additionally, in order for Plaintiff to maintain these contractual relationships with firms like Fidelity and Schwab, Plaintiff requires its employees to undergo recertification of these Confidentiality and Restrictive Covenant Agreements, which can occur annually or every several of years depending on a firm's request. [ECF No. 21 at 9].

[Id. ¶¶ 35-36 (the foregoing language is referred to herein as the "Confidentiality and Non-Solicitation Clauses"); For full agreement, reference ECF No. 1-1 at 22-34.].

On March 1, 2024, Grimes & Co. terminated Carlson's employment and he was subsequently hired at ACM. [Id. ¶ 37]. Defendant's new job duties and responsibilities with ACM as a Senior Wealth Advisor closely align with his previous role as a Financial Advisor for Grimes & Co. [Id. at 75]. On or about April 9, 2024, Grimes & Co. learned that Defendant became affiliated with ACM. [Id.].

### 1. The Defendant's Alleged Wrongful Conduct

Grimes & Co. contends that Defendant violated the Agreement by using the Company's Confidential Information and solicitating business from its clients. [See, generally, id. at 11-16]. Grimes & Co. provided several exchanges between Defendant and Plaintiff's clients, all of which took place shortly after Defendant's departure from Grimes & Co. [See, generally, id.].

Client M.P.[5]

M.P. became a Grimes & Co. client in May 2020. [Id. at 12]. Carlson serviced M.P.'s investment portfolio during his employment with Grimes & Co. [Id.]. After Carlson was terminated from Grimes & Co., on April 9, 2024, M.P. met with Cody Forbush ("Forbush"), another Grimes & Co. employee, to discuss M.P.'s account moving forward. [Id. ¶ 47]. On April 11, 2024, M.P. received an email from Forbush following up on their meeting on April 9, 2024. [Id. ¶ 48]. On April 24, 2024, M.P. responded to Forbush's email, notifying him that "[he] reached out to" Carlson "when he heard that [Carlson] was no longer with [G]rimes[,]" and indicated to Forbush that he would be leaving Grimes & Co. to continue his partnership with Carlson at ACM. [Id. at 40]. On April 25, 2024, M.P. sent another email to Forbush, stating "Brian, [h]ere is the

---

[5] The individuals are referred to in the Complaint anonymously to protect their privacy.

correspondence we just discussed. Note his initial email asking me to make a follow up appointment."[6] [Id. at 39].

In Carlson's opposition filings, he indicates that M.P. reached out to him upon learning of his departure from Grimes & Co. because of their "value[d]" and "good working relationship" that developed over a four-year partnership. [See ECF No. 17 at 4 (citing ECF No. 1-1 at 40)].

Client P.W.

P.W. became a Grimes & Co. client in March 2019. [ECF No. 1-1 ¶ 57]. Carlson serviced P.W.'s investment portfolio during his employment with Grimes & Co. [Id.]. On May 7, 2024, P.W. notified Grimes & Co. that she would be terminating their partnership, and that she was going to work with Carlson at ACM. [Id. ¶ 58].

In Carlson's opposition filings, Carlson asserts that he obtained P.W.'s contact information from the Whitepages database. [ECF No. 18 ¶ 12]. Carlson contends that during his phone call with P.W., the client insisted that Carlson provide his updated contact information because she wanted to leave Grimes & Co. and hire Carlson in order to continue their partnership. [Id.].

Client M.R.

M.R. became a Grimes & Co. client in September 2022. [ECF No. 1-1 ¶ 63]. Carlson serviced M.R.'s investment portfolio during his employment with Grimes & Co. [Id.]. On March 27, 2024, Grimes & Co. employee Timothy D. Rheaume ("Rheaume") met with M.R. [Id. ¶ 64]. Plaintiff alleges that, "[b]ased on Rheaume's conversation with M.R., Mr. Rheaume believed that M.R. would be staying with Grimes & Co." [Id.]. On May 10, 2024, M.R. notified Grimes & Co. that he was terminating their partnership due to account performance. [Id. ¶ 65].

---

[6] M.P. later replied to his own email, saying "[m]y apologies for sending you this message." [ECF No. 1-1 at 39]. Plaintiff asserts that M.P., "intended to send the foregoing email to Mr. Carlson, but mistakenly sent the email to [Grimes & Co. employee] instead." [Id. at 13].

In Carlson's opposition filings, Carlson asserts that he obtained M.R.'s contact information from "a publicly available database." [ECF No. 18 ¶ 13]. Carlson contends that during his phone call with M.R., the client requested that he provide updated contact information via text message. [Id.]. Carlson further indicates M.R. has not transferred his business to ACM and contends that M.R. concluded his partnership with Grimes & Co. due to Carlson's departure, coupled with Grimes & Co.'s recent performance. [Id.].

Client R.P.

R.P. became a Grimes & Co. client in August 2022. [ECF No. 1-1 ¶ 70]. Carlson serviced R.P.'s investment portfolio during his employment with Grimes & Co. [Id.]. Plaintiff has submitted two affidavits from R.P., to support its allegations. [Affidavits of R.P. ("R.P. Aff. 1"), ECF No. 8 at 7-8; ("R.P. Aff. 2"), ECF No. 21 at 12-13].[7]

In or about April 2024, Carlson made a phone call to R.P., announced his new affiliation with ACM, and allegedly stated that, "with ACM, [Carlson] had more freedom and was able to be more aggressive in servicing his clients' expectations." [R.P. Aff. 1 ¶¶ 4,7]. R.P. asserts that although he did not initiate any inquiries about Carlson's employment situation or ACM, "Carlson volunteered that information without [R.P.] prompting him." [R.P. Aff. 2 ¶ 5]. Specifically, R.P. alleges that Carlson asked if he "would like his updated contact information, and additional information from ACM." [R.P. Aff. 2 ¶ 6]. Although R.P. indicates that he did volunteer his email address to Carlson and said he "would accept [follow up information] if [Carlson] wanted to send it to [him,]" R.P. claims to have only done so because he did want to be rude. [See id.].

In Carlson's opposition filings, Carlson asserts that he obtained R.P.'s contact information through R.P.'s son, whose phone number he "obtained through a public database." [ECF No. 17

---

[7] R.P. Aff. 2 is directly in response to Carlson's opposition filings. [R.P. Aff. 2].

at 5]. Carlson contends that during his phone call with R.P., the client initiated inquiries pertaining to whether Carlson "had new employment, asked what company he was working with, and inquired about ACM after Carlson told him that's where he is now working." [Id.]. Carlson further contends that he only provided his updated contact information and details about ACM in response to R.P.'s request for such information. [Id. at 6].

On April 30, 2024, Plaintiff sent letters to Defendant and to ACM demanding that Defendant cease and desist from similar conduct, which they argue "blatantly violates" the Agreement. [ECF No. 1-1 at 45; For full Demand Letters, reference ECF No. 1-1 at 44-54 & 56-66].

### B. Procedural History

On May 22, 2024, Grimes & Co. filed its Complaint, [ECF No. 1-1], in the Worcester Superior Court asserting two counts of breach of contract against Carlson. On June 11, 2024, Defendant removed the case to this Court under diversity jurisdiction. [ECF No. 1]. On June 24, 2024, Grimes & Co. filed this motion for a preliminary injunction. [ECF No. 11]. Defendant filed his opposition on July 8, 2024. [ECF Nos. 17 & 18].

## II.    DISCUSSION

### A. Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (citations omitted). The First Circuit has outlined a four-part framework to determine the appropriateness of a preliminary injunction. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). To obtain a preliminary injunction in this Court, Grimes & Co. bears the burden to show "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is

withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." <u>NuVasive, Inc. v. Day</u>, 954 F.3d 439, 443 (1st Cir. 2020) (quoting <u>Nieves-Márquez v. Puerto Rico</u>, 353 F.3d 108, 120 (1st Cir. 2003)). Although each of the four considerations are important, the most critical factor is the likelihood of success on the merits. <u>Corp. Techs., Inc. v. Harnett</u>, 731 F.3d 6, 9-10 (1st Cir. 2013) (explaining that likelihood of success is the "main bearing wall" of the preliminary injunction framework) (quoting <u>Ross-Simons</u>, 102 F.3d at 16).

### B. Analysis

The relevant points of contention between the parties are as such: (1) whether Defendant misappropriated Grimes & Co.'s Confidential Information; and (2) whether Defendant's conduct in reaching out to his former Grimes & Co. clients constitutes impermissible "solicitation" in violation of Defendant's contractual obligation outlined in the Agreement.

Given the great importance of the "likelihood of success" factor in the preliminary injunction analysis, <u>see id.</u>, the Court will address Grimes & Co.'s "likelihood of success" for each of the two claims separately. However, given the factual overlap underlying both claims and to minimize redundancies where possible, the Court will jointly apply the remaining three preliminary injunction factors.

### 1. Likelihood of Success

To succeed on a breach of contract claim, Grimes must show (1) the existence of a valid contract, (2) that it has performed its obligations under the contract, and (3) a breach of the contract that causes damages. <u>Persson v. Scotia Prince Cruises, Ltd.</u>, 330 F.3d 28, 34 (1st Cir. 2003). Here, the primary contested issue is whether Carlson breached the Confidentiality and

Non-Solicitation Clauses.[8] Since the Agreement contains a Massachusetts choice of law provision, [ECF No. 1-1 at 25], and neither party contests its applicability, the Court will apply Massachusetts law. For the reasons stated below, the Court finds that Grimes & Co. has sufficiently established the likelihood of success element of the preliminary injunction analysis.

### a) Confidential Information Claim

Grimes & Co. contends that Carlson breached the 2023 Agreement by impermissibly using his knowledge of the identities of the company's clients with whom he worked in order to contact them and solicit their business. In response, Carlson argues that he did not breach the 2023 Agreement's Confidentiality Clause because he merely "created a list of clients [he] served while at Grimes … entirely from memory[,]" [ECF No. 18 ¶ 6; see ECF No. 17 at 10-13], adding that, under Massachusetts law, former employees are free to carry away and use general information acquired during the course of employment, including their own recollection of client identities. [ECF No. 17 at 10-12]. Nevertheless, "the fact that no list or paper was taken does not prevent the former employee from being enjoined if the information which he gained through his employment and retained in his memory is confidential in nature." Jet Spray Cooler, Inc. v. Crampton, 282 N.E.2d 921, 924-25 (Mass. 1972) (collecting cases).

Moreover, Carlson's attention to the question of whether remembering the identities of Grimes & Co.'s clients without having misappropriated a physical list constitutes a breach of his confidentiality obligations is entirely misplaced. Indeed, by signing the 2023 Agreement, Carlson agreed "not to use, communicate, reveal or otherwise make available such Confidential Information for any purpose whatsoever" nor to "divulge (or cause to be divulged) any such Confidential Information to any person, partnership, corporation or entity other than the

---

[8] Although Plaintiff addressed the validity of the Confidentiality and Non-Solicitation Clauses, Defendant does not contest their validity.

Company," except for a number of exceptions not relevant here. [ECF No. 1-1 at 22]. The 2023 Agreement in turn defines "Confidential Information" as including "information pertaining to the Company's past, present and prospective clients, including, but not limited to, identity, address, e-mail address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees charged[.]" [Id. (emphasis added)]. Carlson does not dispute that these were the terms of the 2023 Agreement and that he had full knowledge and understanding of their meaning. As such, if the identity of Grimes & Co.'s clients constitute "Confidential Information," it is irrelevant whether Carlson retained that information in his memory or in written form. See Fidelity Brokerage Servs., LLC v. Callinan, No. 1884CV02098BLS1, 2019 WL 1576097, at *5 (Mass. Super. Ct. Feb. 11, 2019) ("The manner in which confidential information is retained by a former employee does not affect whether the information itself is, in fact, confidential.").[9]

The fact that Carlson did not retain any records from his employment at Grimes & Co., leading him to use publicly available databases to search for client contact information, is to no avail. [See ECF No. 18 ¶¶ 6-7]. "The mere fact that one could obtain the name and contact information of a customer via public means does not negate confidentiality[.]" Oxford Glob. Res., Inc. v. Guerriero, No. 03-12078-DPW, 2003 WL 23112398, at *8 (D. Mass. Dec. 30, 2003). While

---

[9] To the extent a question remains as to whether the identity of Grimes & Co.'s clients is confidential, one need only look at the nature of the information and the conduct of the company toward it. See Jet Spray Cooler, 282 N.E.2d at 925 (listing factors relevant to determine whether information sought to be protected is confidential). Based on the facts before the Court, the identities of Grimes & Co.'s clients do not appear to be known outside the company. Grimes & Co. "has also invested significant time, effort, and resources to develop" this confidential information, including through its contractual relationships with promoting firms, such as Fidelity and Schwab. While it is unclear whether these promoting firms have some knowledge of the clients' identities, their relationship with Grimes & Co. does not appear to be a competitive one. Further, Grimes & Co. "undertakes a comprehensive, consistent and effective approach to protecting its Confidential Information," including by adopting "a comprehensive privacy policy," "a written information security policy," "us[ing] computer passwords and multi-factor authentication," "set[ting] access restrictions," and by including relevant language in offer letters, employment agreements, and training materials. [ECF No. 12 at 3-5].

it may be true that the contact information of Grimes & Co. clients could be found in publicly available databases, as was the case with P.W., M.R., and R.P., one would necessarily need to know that these individuals are or were in business with Grimes & Co. in order to search for their contact information. In other words, the clients' identities are confidential information that no third party could easily obtain. Grimes & Co. is therefore likely to succeed in showing that Carlson has breached the 2023 Agreement's Confidentiality Clause.

### b) Solicitation Claim

Grimes & Co. contends that Carlson additionally breached the 2023 Agreement's Non-Solicitation clause on at least two occasions, arguing that Carlson's communications impermissibly crossed the line into solicitation when he reached out to M.P. and R.P. to inform them of his departure from Grimes & Co. Carlson denies these averments and responds that he merely notified former clients of his departure from the company, answered any questions posed by these former clients, and provided his new contact information, if prompted. [ECF No. 17 at 9-10; ECF No. 18 ¶¶ 8-9, 11-15, 17]. Pointing to Massachusetts state caselaw, Carlson argues that these actions do not, without more, amount to solicitation. [ECF No. 17 at 9-10]. Certainly, "a financial advisor's simple 'announcement' to his or her former clients of a change in the advisor's place of employment is not, by itself, a 'solicitation.'" Callinan, 2019 WL 1576097, at *6 (citing Getman v. USI Holdings Corp., No. 05-3286-BLS2, 2005 WL 2183159, at *4 (Mass. Super. Ct. Sept. 1, 2005)). However, the Court is unconvinced that Carlson's notifications were only intended to inform former clients of his departure.

As an initial matter, the Court is unpersuaded by Grimes & Co.'s argument that Carlson engaged in solicitation when he contacted M.P. [ECF No. 12 at 13]. In April 2024, after Carlson's termination, M.P. met with Grimes & Co. employee Forbush to review M.P.'s accounts and

discuss that Forbush would serve as Carlson's replacement in servicing the accounts. [ECF No. 1-1 ¶¶ 46-47]. After a couple email exchanges in which Forbush attempted to follow up to their discussion, [id. ¶¶ 48-50; id. at 38-42], M.P. responded on April 24, 2024, stating:

> Cody, I reached out to Brian Carlson when I heard he was no longer with Grimes. . . . [H]is new company looks to have more frequent and more understandable communication both written and recorded podcast.
>
> If they have not received it yet, Grimes will be receiving the required documentation for the change.

[Id. ¶ 50 (emphasis added); id. at 40 (emphasis added)]. Because M.P. contacted Carlson of his own volition to transfer his accounts to ACM, we cannot arrive to the conclusion that Carlson engaged in solicitation. Tellingly, Grimes & Co. does not put forth any allegations suggesting that Carlson initiated contact with M.P. or detailing the substance of those communications. Instead, Grimes & Co. would have the Court improperly adopt a far-reaching inference based on an email M.P. sent to Forbush the next day. The email, which M.P. allegedly intended to send to Carlson instead, stated "Brian, [h]ere is the correspondence we just discussed. Note his initial email asking me to make a follow up appointment." [Id. ¶¶ 51-52; id. at 39]. Other than the fact that M.P. and Carlson were in communication and that M.P. intended to inform Carlson of the exchanges with Forbush, the evidence does not demonstrate that Carlson engaged or even attempted to solicit M.P.

With respect to R.P, the Court finds that Grimes & Co. is likely to succeed in showing that Carlson engaged in solicitation. According to Grimes & Co., in early May 2024, Carlson initiated contact with R.P. by phone after getting his contact information from R.P.'s son, who Carlson had previously searched online and contacted a day earlier. [ECF No. 12 at 13; ECF No. 1-1 ¶ 71]. Carlson informed R.P. of his departure from Grimes & Co. and his new role at ACM. [ECF No. 12 at 13; ECF No. 1-1 ¶ 72; ECF No. 6 ¶ 7]. Carlson further noted that if R.P. wanted more information on ACM, Carlson would provide it. [ECF No. 12 at 13; ECF No. 1-1 ¶ 72]. In an

affidavit filed earlier in this litigation, R.P. indicated that he told Carlson he "would accept the information if [Carlson] wanted to send it," adding that he "did not request the information from Mr. Carlson." [ECF No. 6 ¶ 8]. R.P. later received an email from Carlson with his contact information and information about ACM. [Id. ¶ 9; ECF No. 1-1 ¶ 72].

From his part, Carlson disputes the accuracy of Grimes & Co.'s characterization of his communication with R.P. Instead, Carlson asserts that when he called R.P., he merely told him about his departure from Grimes & Co., adding that it was R.P. who inquired about Carlson's new employment and subsequently about ACM. [ECF No. 18 ¶ 14]. Carlson concedes that he offered to provide R.P. with his updated contact information and information about ACM. [Id.]. However, Carlson posits that this did not happen before R.P. requested the information, reasoning that R.P. had to first voluntarily provide his email address for Carlson to later email him, as he did not have it. [Id. ¶¶ 14-15]. Carlson thus asserts that he could not have engaged in any solicitation when he communicated with R.P.

In a second affidavit by R.P. accompanying Grimes & Co's reply brief, he states that he interpreted Carlson's call "as a fishing attempt by him to explore the possibility of continuing to work with me." [ECF No. 21 at 12]. R.P. also disputes that he made any inquires about Carlson's new employment or ACM, noting that he had no interest in resuming a business relationship with Carlson given "serious concerns" he had about Carlson's performance as his financial advisor. [Id. at 12-13]. R.P. explains that "[i]n reality, Mr. Carlson asked me if I would like his contact information, and additional information about ACM Wealth. Not wanting to be rude, I volunteered my email address and told him I would accept it if he wanted to send it to me." [Id. at 13 (emphasis added)].

Notwithstanding the parties' conflicting accounts, the Court is concerned that Carlson's communication crossed the line into solicitation, as evidenced by R.P.'s characterization that he volunteered his email address because he did "[n]ot want[] to be rude." [Id.]. In other words, the conversation progressed in such manner that led R.P. to feel compelled to volunteer his email address to Carlson so he could send his contact information and information about ACM. We believe that this is evidence of solicitation. Moreover, the manner in which Carlson contacted his former clients (i.e., primarily by telephone with little to no record about those calls) and the relatively low level of interest that the former clients had to show in order for Carlson to discuss his new employment at ACM and elicit a pitch (i.e., providing additional information and discussing employment at new company "if and when directly asked by an individual" or "unless and until directly and specifically asked by an individual") [ECF No. 18 ¶ 8], "leads the Court to believe, by a preponderance of the evidence, that [Carlson's] client calls were effectively solicitations wrapped in the thin veneer of an announcement." Callinan, 2019 WL 1576097, at *7. These communications were not intended simply to announce Carlson's departure as he suggests, "but rather to create an almost certain opportunity for [Carlson] to persuade them to transfer their investment accounts to [ACM.]" Id. Accordingly, the Court is preliminarily satisfied that Carlson has engaged in solicitation, constituting a breach of his obligations under the 2023 Agreement.

### 2. Irreparable Harm

Irreparable harm is "an essential prerequisite for a grant of injunctive relief." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000). To make a valid showing of irreparable harm, a plaintiff must show that it does not have an adequate remedy at law, Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005) ("[A]n injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full

adjudication on the merits, or by a later-issued damages remedy[]"), and rely "on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Wash. Tr. Advisors, Inc. v. Arnold, 646 F. Supp. 3d 210, 220 (D. Mass. 2022) (quoting Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004)).

Grimes & Co. contends that Carlson's misappropriation of its Confidential Information lessens the competitive advantage that Grimes & Co. has developed to remain competitive in the investment advisory industry. [ECF No. 12 at 16-17]. In response, Carlson asserts that Grimes & Co. failed to establish a significant risk of irreparable harm for two reasons. First, Carlson maintains that Grimes & Co's allegations illustrate that any damages it suffered are quantifiable, and therefore present an adequate remedy at law. [ECF No. 17 at 13-14]. And second, Carlson posits that a lack of irreparable harm is evidenced by the two-month period that it took Grimes & Co. to seek injunctive relief in this Court. [Id. at 14].

The Court is nevertheless convinced that Grimes & Co. has made a sufficient showing of irreparable harm. Carlson fails to recognize that evidence of threatened loss of customers or goodwill certainly supports a finding of the possibility of irreparable harm. See Bear, Stearns & Co. v. Sharon, 550 F. Supp. 2d 174, 178 (D. Mass. 2008) ("[D]amage to client relationships and customer goodwill has been held to be 'irreparable harm' under Massachusetts law." (citation omitted)). While Grimes & Co. is not seeking to enjoin Carlson from providing services to those clients who have already transferred their business to him and ACM on grounds that Grimes & Co. will pursue monetary damages for those transgressions, [ECF No. 1-1 at 16 n.4], Carlson's actions show a plausible risk of future loss of client goodwill and confidential information, which would not be easily quantified, see Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 241 (D. Mass. 2011) (finding a risk of irreparable harm where there is a "plausible threat of future

. . . customer defections and the damages associated with those defections may escape accurate measurement").

Grimes & Co. has already lost several clients in just a few weeks after Carlson's departure from the company. [ECF No. 1-1 ¶¶ 46-69]. Carlson also made phone calls to several active Grimes & Co. clients to announce his new affiliation with ACM. And, during at least one occasion, when Carlson contacted Grimes & Co. client R.P., Carlson's phone call was interpreted as a "fishing attempt," pressuring R.P. to volunteer his email address and accept additional information about ACM, "[n]ot wanting to be rude." [ECF No. 21 at 12-13]. The Court thus finds that there is a risk that Grimes & Co. will continue to lose client goodwill and confidential information absent injunctive relief. While it may be the case that the economic value of a given client may be calculated, see Bear, Stearns & Co., 550 F. Supp. 2d at 178 ("[T]he financial services industry is uniquely skilled at computing the economic value of a given client"), the Court does not believe that Grimes & Co.'s injury is limited to the investments or commissions that would have flowed from client accounts. Significantly, Grimes & Co. has invested substantial resources to maintain contractual arrangements with Fidelity and Schwab, through which it has developed its client goodwill and amassed confidential and proprietary information. [ECF No. 12 at 2-3]. Indeed, Grimes & Co. estimates that Fidelity and Schwab referred approximately half of its client base, which in turn referred the remaining clients to Grimes & Co. services. [Id. at 3]. As such, the loss extends beyond the departure of clients and the respective loss of business and encompasses the use of confidential information and the resources spent both to acquire and develop the client base as well as to collect, process, and maintain confidential information.[10]

---

[10] Because the Court finds that Grimes & Co. made a sufficient showing of irreparable harm, the Court need not delve into Grimes & Co.'s argument that an irreparable harm clause in the 2023 Agreement, [ECF No. 1-1 at 24], also suffices to meet this requirement.

Finally, the delay in seeking injunctive relief before this Court is of no consequence under the circumstances. Although Grimes & Co. filed the present motion nearly two months after initially filing the case in state court, the Court finds that Grimes & Co. took diligent action during that timeframe. Indeed, after Grimes & Co. filed its verified complaint and original motion for preliminary injunction in Worcester Superior Court on May 22, 2024, it filed a motion for short order of notice, requesting that the Worcester Superior Court schedule a hearing on the matter on June 5, 2024; after Carlson removed the action to this Court, Grimes & Co. promptly filed a notice of appearance, corporate disclosure statement, and notice of supplemental filing in the state court action on June 18, 2024, [ECF Nos. 6-8]; and re-filed its motion for preliminary injunction on June 21, 2024, [ECF No. 11]. These actions are plainly inconsistent with Carlson's characterization that Grimes & Co. "sat on its hands and delayed seeking injunctive relief for nearly two months[.]" [ECF No. 17 at 14]. Carlson also seems to neglect that whatever delay, albeit negligible, was partially caused by its action to remove the case to this Court. Grimes & Co.'s actions clearly demonstrate that it acted diligently and without undue delay given the circumstances. The short delay does not belie the notion that Grimes & Co. has established a showing of irreparable harm.

### 3.   Balance of the Harms or Balance of the Equities

The balance of the equities assesses "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues[.]" Ross-Simons, 102 F.3d at 15. In the context of the enforcement of restrictive covenants, "the reasonable needs of the former employer for protection against harmful conduct of the former employee must be weighed against both the reasonableness of the restraint imposed on the former employee and the public interest." Wash. Tr., 646 F. Supp 3d at 221 (quoting All Stainless, Inc. v. Colby, 308 N.E.2d 481, 485 (Mass. 1974)). Generally, an employer is without a doubt entitled to protect its own goodwill, but where,

as here, a financial advisor develops goodwill through its employments with a financial advisory company, "the company's goodwill and the employee's goodwill are inevitably intertwined." <u>Id.</u> (quoting <u>Smith Barney Div. of Citigroup Glob. Mkts. Inc. v. Griffin</u>, No. 08-0022-BLS1, 2008 WL 325269, at *4 (Mass. Super. Ct. Jan. 23, 2008)).

Grimes & Co. contends that it will suffer immeasurable loss of business and client goodwill absent the requested injunctive relief, reasoning that it would allow Carlson to continue soliciting Grimes & Co. clients with whom he previously worked or about who he obtained confidential information. [ECF No. 12 at 17]. It adds that the harm to Grimes & Co. outweighs any potential harm to Carlson if he were enjoined because the requested injunctive relief will not have a constrictive impact on his livelihood. [<u>Id.</u> at 18]. Grimes & Co. is not seeking to prevent Carlson from working for ACM or to deprive him of the opportunity to work as a financial advisor. [<u>Id.</u>]. On the contrary, the preliminary injunction would allow Carlson to continue his employment with ACM, serving existing ACM clients, including former Grimes & Co. clients who have already transferred their business to ACM, and even accepting new business from Grimes & Co. clients with whom he did not work, obtain confidential information, or solicit. [<u>Id.</u>].

In response, Carlson posits that an injunction would jeopardize his ability to earn a living, as he could potentially lose his job and professional standing in the financial services industry. [ECF No. 17 at 15]. Carlson also argues that no harm will occur against Grimes & Co. if the Court were to deny the requested injunctive relief, stating perfunctorily that Grimes & Co. has not established that Carlson breached the Confidentiality and Non-Solicitation Clauses, and that Grimes & Co. would suffer a significant risk of irreparable harm. [<u>Id.</u>].

Turning to the analysis, the Court finds that balance of the harms tips in Grimes & Co.'s favor. Any hardship Carlson will suffer from being required to comply with his obligations under

the 2023 Agreement cannot be said to present an unreasonable restraint that outweighs the losses that Grimes & Co. is facing. To hold differently would be a blatant disregard to the parties' preexisting contractual agreement and a reward for Carlson's questionable actions. We agree with Grimes & Co. that even if the preliminary injunction would force Carlson to cease contact with all Grimes & Co. clients for any business-related reason, Carlson would still be able to work as a financial advisor for ACM and service any clients he did not solicit, in addition to those he already solicited. Further, Carlson has not made any showing to support his argument that the requested injunctive relief would have an impact on his livelihood such that he would lose his employment with ACM and standing in the financial services industry.

### 4. Public Policy

A preliminary injunction is appropriate where there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez,, 353 F.3d at 120. This factor primarily addresses the impacts on non-parties rather than the parties. Generally, the public has a strong interest in the enforcement of reasonable restrictive covenants. See Agero Admin. Serv. Corp. v. Campolo, 366 F. Supp. 3d 170, 175 (D. Mass. 2019) ("[T]he public interest is served by enforcing reasonable restrictive covenants, . . . includ[ing] [a] customer non-solicitation provision[.]"); Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Servs., LLC, 707 F. Supp. 2d 92, 112 (D. Mass. 2010) ("[T]he public interest is served by enforcing contractual obligations, including reasonable restrictive covenants, between consenting parties."). The public interest is similarly served when a company's proprietary and confidential information is protected. See C&W Facility Servs. Inc. v. Mercado, No. 18-11915-FDS, 2018 WL 4854630, at *3 (D. Mass. Oct. 5, 2018) ("[T]he public has a general interest in … guaranteeing companies protection for their confidential or proprietary information."); KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, No. 4:21-CV-10572-TSH,

2021 WL 6275214, at *11 (D. Mass. Aug. 23, 2021) ("[T]he public interest supports enforcing the … contractual obligations and protecting [plaintiff's] right to its confidential information.").

Here, the preliminary injunction serves the public interest in enforcing the parties' contractual arrangements. Carlson's argument that the requested injunctive relief would deprive clients of their freedom of choice is plainly unavailing. [ECF No. 17 at 16]. Indeed, as aforementioned, Grimes & Co. is neither seeking to enjoin Carlson from serving existing ACM clients; former Grimes & Co. clients who have already transferred their business to ACM; nor Grimes & Co. clients with whom he did not work, obtain confidential information, or solicit, but who voluntarily chose to transfer their business to ACM. As such, the preliminary injunction would not impinge on the public's right to freely choose a financial advisor. The Court finds that there is no friction between the issuance of a preliminary injunction and the public interest such that this factor weighs in favor of granting the requested injunctive relief.

### III.    Conclusion and Preliminary Injunction

The Court, after a full hearing of which notice was provided to Carlson and he was given an opportunity to be heard, hereby grants the preliminary injunctive relief of Grimes & Co. The Court finds that Grimes & Co. satisfies the elements necessary to obtain this relief. It is therefore hereby ordered that a Preliminary Injunction be entered restraining and enjoining Defendant Brian G. Carlson as follows:

1. *Disclosure of Solicitations of Clients.* Defendant is ordered to immediately disclose all solicitations, conversations, or efforts made by him on his own behalf or on behalf of Advisors Capital Management, LLC ("ACM"), or any other person, business, company, corporation, entity or firm which competes with Grimes & Co., to divert or take away investment advisory (i.e., investment management, financial planning, and related

consulting services) and/or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from any of those clients with whom he worked and/or about whom he acquired Confidential Information during his employment with Grimes & Co. (hereinafter "Clients") since March 1, 2024.[11]

2. *Discontinue Solicitations of Clients.* With respect to any of the Clients, Defendant is hereby restrained from contacting or soliciting said Clients, or diverting or attempting to divert business of said Clients away from Grimes & Co. or otherwise interfering with Grimes & Co.'s relationship with any of said Clients. This Preliminary Injunction specifically restricts Defendant from any further efforts to solicit, divert, or take away investment advisory and/or securities and insurance sales or brokerage business from any Clients.

3. *Disclosure of Acceptance of Business from Clients.* Defendant is ordered to immediately disclose all investment advisory and/or securities and insurance sales or brokerage business he or ACM (as a result of Defendant's solicitation) has accepted from Clients since March 1, 2024.

4. *Non-Acceptance of Business from Clients.* Defendant, on his own behalf or on behalf of ACM or any other person, business, company, corporation, entity or firm is hereby restrained from rendering or accepting any investment advisory and/or securities and

---

[11] For purposes of this Order, Confidential Information shall be defined as: confidential and proprietary business information and trade secrets regarding its investment advisory operations, methods and practices, including, but not limited to, books, records, lists, computer programs, and other information or documents regarding the Company's revenue, business methods, investment advisory process and practices (which includes financial planning and investment management), marketing strategies and plans, and referral sources, as well as information pertaining to the Company's past, present and prospective clients, including, but not limited to, identity, address, email address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees charged.

insurance sales or brokerage business from any Clients that result from Defendant's solicitation in violation of the Agreement.[12]

5.  *Identification of Disclosed Confidential Information.* With respect to any Confidential Information including, but not limited to, information concerning Grimes & Co.'s clients, disclosed by Defendant to ACM or any other person, business, company, corporation, entity or firm, Defendant is ordered to immediately identify to Grimes & Co. all such information disclosed. With respect to this identification, Defendant must include (a) the nature of the information, (b) the date of disclosure, (c) the nature of the disclosure, (d) the purpose of the disclosure, (e) the use made of the information disclosed, and (e) the name and position of all employees of ACM or any other person, business, company, corporation, entity or firm which competes with Grimes & Co., to whom such disclosures have been made.

6.  *Delivery of Confidential Information.* Defendant is ordered to deliver all Confidential Information in his possession to Grimes & Co. In conjunction with the delivery of said Confidential Information, Defendant shall make copies to be retained by counsel to be used solely for the purposes of this litigation.

7.  *Deletion of Confidential Information.* With respect to any Confidential Information Defendant may have in his possession, he is ordered to permanently delete said Confidential Information and certify under oath to this Court that he has done so.

---

[12] This Preliminary Injunction does not enjoin Defendant from accepting business from Grimes & Co. Clients that he did not solicit to provide investment advisory and/or securities and insurance sales or brokerage business, but who nonetheless contact Defendant voluntary and without prompting by Defendant or anyone on his behalf. Moreover, this Preliminary Injunction does not enjoin Defendant from providing services to those Clients who have already transferred their business to him and ACM as of the date of this Order.

8. *Restraint on Disclosure or Use of Confidential Information.* Defendant is hereby restrained from further use or disclosure of the Confidential Information of Grimes & Co.

**SO ORDERED.**

Dated: December 12, 2024

 */s/ Margaret R. Guzman*
Margaret R. Guzman
United States District Judge